IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Christine M. Arguello**

Civil Action No. 11-cv-00149-CMA-MJW

MELISSA HUFF,

    Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS/LIMON CORRECTIONAL FACILITY,
TOM CLEMENTS, in his official capacity,
TRAVIS TRANI, in his individual and official capacity,
FRANCIS MASSINGILL, in her individual and official capacity,
RANDY LIND, in his individual and official capacity,
WILLIAM RUSHER, in his individual and official capacity,

    Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendants Colorado Department of Corrections ("CDOC"), Tom Clements, Travis Trani, Francis Massingill, Randy Lind, and William Rusher's (collectively, "Defendants") Amended Motion for Summary Judgment.[1]

---

[1] In her Response, Plaintiff asserts that Warden Angel Medina "remains a defendant." (Doc. # 64 at 39 n.4.) Mr. Medina was named as a defendant in the original complaint (Doc. # 1), but his name was omitted from the caption of the Amended Complaint. (Doc. # 22.) Thus, Mr. Medina was effectively dismissed from the case. Plaintiff now claims that the omission of Mr. Medina from the caption of the Amendment Complaint was "inadvertent." Regardless of whether the omission was intentional or not, Plaintiff's assertion that Mr. Medina "remains a defendant" does not make it so. Under Fed. R. Civ. P. 10(a), "[t]he title of the complaint must name all the parties." If Plaintiff wanted Mr. Medina to remain a defendant in this case, she could have sought leave under Fed. R. Civ. P. 15(a) to amend the complaint.

    A plaintiff's failure to name a defendant in the caption of a case may be excused when the plaintiff is *pro se*. *See Thomas v. Kan. Soc. & Rehab. Servs.*, No. 10-4154, 2012 WL 1034939, at *1 (D. Kan. Mar. 27, 2012). Plaintiff, however, is represented by counsel and her failure to comply with the Federal Rules of Civil Procedure is not excused by the flippant remark (in a footnote, nonetheless) that Mr. Medina "remains a defendant." Moreover, even if Mr. Medina remained a defendant in this case, he would be entitled to summary judgment on Plaintiff's malicious prosecution claim for the reasons discussed in Section "C" of the analysis.

(Doc. # 59.) Pursuant to the allegations in her Amended Complaint, Plaintiff Melissa Huff, a former employee of the CDOC, brings three claims for relief: a 42 U.S.C. § 1983 First Amendment retaliation claim, a Title VII sex discrimination claim, and a § 1983 malicious prosecution claim. (Doc. # 22.) Jurisdiction is proper under 28 U.S.C. § 1331.

## I. BACKGROUND

The following facts are undisputed, unless otherwise noted. The Court will elaborate, as needed, in its analysis section.

Plaintiff began her employment with the CDOC in 1991 at the Limon Correctional Facility ("Limon"). In 2003, Plaintiff was promoted to Sergeant, Correctional Officer II, a position she held until she left the CDOC on October 31, 2010.[2]

In 2007, Major Randy Lind was transferred to Limon. Major Lind devised an "implementation adjustment" policy (the "IA Policy") that redefined the work units at Limon, thereby changing how vacation and days off were scheduled. The IA Policy applied to all correctional officers at Limon, except for those assigned to the graveyard shift. In April of 2008, Plaintiff complained to Major Lind about the IA Policy. Plaintiff claims that after her meeting with Major Lind, inmates began to grieve her.[3] Plaintiff

---

[2] CDOC's correctional facilities use a chain of command supervisory/reporting structure. The chain of command ascends as follows: COI, COII (Sergeant), CO III (Lieutenant), CO IV (Captain), COV (Major), Associate Warden, and Warden.

[3] Plaintiff "partially disputes" this fact. It is hard to comprehend how this could actually be a disputed fact given that Plaintiff testified at her deposition that inmates began to grieve her after she complained about the IA Policy to Defendant Lind. (Doc. # 59-1 at 43:4-11.) In her explanation as to why the fact is disputed, Plaintiff asserts that "[i]nmates began to grieve [Plaintiff] with greater frequency and Lind took an unusual interest in the grievances." (Doc.

believes that Major Lind directed an inmate and his friends to file these grievances against her in retaliation for her complaining about the IA Policy.

As the Custody and Control Major, Major Lind was responsible for receiving inmate grievances and delegating them to the appropriate captain for investigation and determination. Major Lind ordered Captain Rusher to investigate the approximately seven inmate grievances against Plaintiff and to "get to the bottom of them." Although Defendant Rusher denied each of the grievances, Captain Rusher also issued a Performance Documentation Form on August 13, 2008, which summarized the grievances and performance issues, and counseled Plaintiff on her behavior towards inmates. (Doc. # 59-5.)

Later in January of 2009, Plaintiff met with Associate Warden Francis Massingill, who is female, and complained that Major Lind had instructed Captain Rusher to harass

---

# 64, ¶ 14.) In addition to the fact that Plaintiff's explanation is not responsive, Plaintiff's citation to her deposition testimony does not support her assertion that Lind "took an unusual interest in the grievances." (Doc. # 64-5 at 114:24-116:21.)

Unfortunately, Plaintiff's response to Defendants' facts section is replete with assertions that are argumentative, non-responsive, and/or unsupported by her citations to record evidence. For example, Plaintiff also partially disputes the fact that "Plaintiff believes that Major Lind retaliated against her for complaining about the IA charge by directing an inmate and his friends to grieve her." (Doc. # 59, ¶ 15.) Although that assertion is also supported by Plaintiff's own deposition testimony, Plaintiff "disputes" the fact by offering additional facts, such as alleging that Major Lind directed Captain William Rusher to issue a disciplinary action against Plaintiff. (Doc. # 64, ¶ 15.) As his deposition, Captain Rusher was asked if "at any point prior to issuing this performance documentation form, did Major Lind express an interest or a desire to have Ms. Huff disciplined for her involvement or behavior with regards to these grievances?" Captain Rusher responded "No." (Doc. # 64-3 at 36:17-24.) Captain Rusher also testified that issuing the Performance Documentation was his own idea. (*Id*. at 35:18-23.) Thus, Plaintiff's citation to Captain Rusher's deposition directly contradicts her factual assertion that Major Lind directed Captain Rusher to issue the disciplinary action. Such sham disputes hinder the Court's ability to discern which facts are actually in dispute. Nevertheless, despite Plaintiff's attempt to muddy the evidentiary waters, it appears that very few **material** facts are actually disputed.

her by investigating the inmate grievances and had prohibited her from deploying on a Critical Incident Response Team ("CIRT").[4] After speaking with Plaintiff and Captain Rusher, and reviewing the reports related to the inmate grievances, Associate Warden Massingill concluded that Captain Rusher was doing his job, had not targeted Plaintiff, and that Plaintiff had not presented her with the true facts. Associate Warden Massingill asked Major Lind and Captain Rusher to draft a corrective action, which was issued on February 19, 2009.[5] (Doc. # 59-11.) The corrective action detailed numerous instances where Plaintiff's interactions with other staff members were considered to be unprofessional and/or hostile. (*Id.*)

On February 27, 2009, Plaintiff grieved her CIRT removal and the corrective action, alleging gender discrimination, retaliation, harassment, and a hostile work environment. (Doc. # 59-12.) In early March, Warden Trani referred the discrimination and retaliation allegations to the CDOC Office of the Inspector General ("OIG") for investigation. (Doc. # 59-13.) Following an investigation that included numerous witness interviews, the OIG was unable to substantiate Plaintiff's allegations. The OIG forwarded their investigative materials to Warden Trani. Warden Trani then issued a

---

[4] The parties dispute whether Plaintiff also complained of discrimination when she met with Associate Warden Massingill.

[5] Warden Travis Trani delegated appointing authority to Associate Warden Massingill for the limited purpose of handling Plaintiff's performance issues during the months of January and February 2009. Although Plaintiff contends that Associate Warden Massingill did not have the authority to issue a corrective action, such assertion is directly contradicted by the deposition testimony of Warden Trani. (Doc. # 68-8 at 32:10-14.)

response on June 4, 2009 to Plaintiff's grievance, explaining his reasons for upholding three of the five allegations from the original corrective action. (Doc. # 59-19.)

In August of 2009, OIG Investigator Robert Thiede began an investigation of Plaintiff that encompassed both a criminal investigation and a professional standards investigation. The investigations were based on a claim that Plaintiff had falsified a report that an inmate had exposed himself to her during count, possibly in retaliation against the inmate for an earlier issue. Investigator Thiede informed Associate Warden Massingill of the issues regarding Plaintiff's potential misconduct, and she authorized him to proceed with the professional standards investigation. Although Investigator Thiede informed Associate Warden Massingill of the concurrent criminal investigation, she did not request that he investigate Plaintiff for criminal conduct, nor would she have had the authority to do so. (Doc. # 68-10, ¶¶ 5-7.)

After conducting his investigation, Investigator Thiede brought the results to the local district attorney for review. The district attorney reviewed the case and approved the filing of a criminal summons. On August 21, 2009, Investigator Thiede served a criminal summons and complaint upon Plaintiff. Plaintiff then filed a grievance against Investigator Thiede, alleging that he acted unprofessionally when serving the summons. The OIG conducted a new investigation of these claims, including interviewing witnesses and listening to the recording of the meeting. In the OIG's report, dated September 1, 2009, the OIG found that "it appears [Plaintiff] has made false allegations against Investigator Thiede in an attempt to alter the outcome of the pending criminal

charges against her." (Doc. # 59-24 at 7.) On December 4, 2009, Warden Medina, who had taken over for Warden Trani, issued Plaintiff a corrective action for making false allegations against Investigator Thiede. (Doc. # 59-25.) On April 1, 2010, Captain Rusher issued Plaintiff a Performance Documentation Form for making an inappropriate entry in an inmate's chronological log. (Doc. # 59-26.)

On June 24, 2010, Judge T.L. Fisher of the Eighteenth Judicial District dismissed the criminal charges against Plaintiff. Plaintiff filed a charge with the EEOC on October 26, 2010. (Doc. # 59-28.) On October 31, 2010, Plaintiff was offered another job at Lincoln Community Hospital and she quit the CDOC.[6] (Doc. # 58-1 at 117:13-17.)

Plaintiff filed her First Amended Complaint on May 19, 2011. (Doc. # 22.) Defendants filed their Amended Motion for Summary Judgment on February 21, 2012. (Doc. # 59.) Plaintiff responded on March 23, 2012, and Defendants replied on April 17, 2012. (Doc. ## 64, 68.)

## II. **STANDARD OF REVIEW**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

---

[6] Plaintiff alleges that she was "constructively discharged." As will be explained in the analysis section of this Order, there is no merit to this allegation.

(1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670-71. In attempting to meet that standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.  ANALYSIS

### A.    FIRST AMENDMENT RETALIATION CLAIM

Plaintiff alleges that Defendants unlawfully retaliated against her for exercising her First Amendment right to free speech "when she expressed her disagreement with proposed policy changes affecting the way CDOC staff would accrue leave time." (Doc. # 22, ¶ 65.)  In her Response (but not in her Amended Complaint), Plaintiff also asserts that she was retaliated against because she complained of harassment and discrimination.  (Doc. # 64 at 25-26.)

By entering government service, public employees "accept certain limitations on [their] freedom."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  When the government functions as an employer rather than as a sovereign entity, it is granted "a significant degree of control over [its] employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *Id.*  However, "[p]ublic employees do not surrender their First Amendment rights by virtue of their employment with the government."  *Martin v. City of Del City*, 179 F.3d 882, 886 (10th Cir. 1999).  Rather, public employees retain the right "as citizens to comment on matters of public interest."  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  Consequently, courts must

balance the individual and societal interests promoted by free speech with the needs of government to provide effective services. *See Garcetti*, 547 U.S. at 420. To achieve this balance, the Tenth Circuit employs the five-part test set out in *Pickering* and modified by *Garcetti* ("*Garcetti/Pickering*"):

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). "The first three prongs are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the factfinder." *Id.* (internal quotation marks omitted). Although Defendants argue that Plaintiff has failed to meet all but the third prong of *Garcetti/Pickering*, the Court need not address all of Defendants' arguments because Plaintiff cannot show that her "speech was on a matter of concern."

"Matters of public concern are those of interest to the community, whether for social, political, or other reasons." *Leverington v. City of Colo. Springs*, 643 F.3d 719, 727 (10th Cir. 2011). To determine whether speech pertains to a matter of public concern the Court must consider the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). However, "the crux of the public concern content inquiry" is what was actually said. *Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012).

The Court finds that Plaintiff's disagreement with the IA Policy was not speech on a matter of public concern. As Plaintiff admits, the IA Policy applied only to correctional officers at Limon who did not work the graveyard shift. Thus, the IA Policy concerned only internal working conditions at Limon, and is not "a matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146; *see also David v. City & Ctny. of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996) ("speech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern."). Plaintiff argues that her disagreement with the IA Policy was speech on a matter of public concern because it pertained to "improper operations of the government" and evidence "of other malfeasance" on the part of public officials. (Doc. # 64 at 25.) Plaintiff has not articulated how a modification of the way leave time accrued for some correctional officers at Limon was "improper" or an act of "malfeasance," nor has she asserted any facts from which a reasonable trier of fact could determine that the implementation of the IA Policy was anything other than a routine management decision. Regardless of whether the IA Policy was fair or unfair, the First Amendment does not protect a public employee's "criticisms of internal management decisions." *Gardetto v. Mason*, 100 F.3d 803, 814 (10th Cir. 1996) (citation omitted); *see also Connick*, 461 U.S. at 149 ("the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.")

In her Response, Plaintiff also asserts that her various complaints of discrimination satisfy the "public concern" prong of *Garcetti/Pickering*. The first problem with this argument is that Plaintiff alleged in her Amended Complaint only that she was retaliated against because of her criticism of the IA Policy. The Federal Rules of Civil Procedure do not "permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case." *Orr v. City of Albuquerque*, 417 F.3d 1144,1153 (10th Cir. 2005) (quoting *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991)); *see also Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) (refusing to consider claim not raised in complaint). Although the Court could refuse to consider Plaintiff's new theory on the grounds that it is outside the scope of the Amended Complaint, out of abundance of caution and because there is no prejudice to Defendants, the Court will address her new claim on the merits.

Plaintiff argues that speech addressing "gender discrimination in the public workplace . . . is **always** a matter of public concern." (Doc. # 64 at 25-26) (emphasis in original). Plaintiff ignores numerous cases in which the Tenth Circuit has held that allegations of sexual harassment and discrimination are **not** matters of public concern. *See, e.g.*, *David*, 101 F.3d at 1356 (holding that multiple complaints by plaintiff that she was "personally subjected to sexual harassment, retaliation, and unwarranted disciplinary actions . . . do not involve matters of public concern"); *Kosan v. Utah Dep't of Corr.*, 290 F. App'x 145, 152 (10th Cir. 2008) (unpublished) (holding that allegations of sexual harassment were not matters of public concern); *Woodward v. City of*

*Worland*, 977 F.2d 1392, 1403-04 (10th Cir. 1992) (holding that sexual harassment complaints were not matters of public concern because the thrust of the plaintiffs' speech was that "they personally were being subjected to sexual harassment and they wanted it to stop."). Because Plaintiff's complaints of harassment and discrimination related to purely personal grievances affecting her own conditions of employment, such complaints were not on a matter of public concern. Thus, Plaintiff's § 1983 First Amendment retaliation claim fails as a matter of law.

**B.     SEX DISCRIMINATION CLAIM**

The Court begins its analysis on Plaintiff's Title VII claim by emphasizing that her claim is one for "sex discrimination." (Doc. # 22 at 14.) She alleges that "Defendants treated [her] less favorably than similarly situated male officers." (Doc. # 22, ¶ 75.) This adverse treatment allegedly consisted of:

> Defendants' launching multiple investigations into her performance, taking numerous unwarranted disciplinary actions against her, requiring her co-workers to file false reports against her, failing to take reasonable measures to ensure her safety after four [Limon] inmates discussed a plot to murder her, and filing baseless criminal charges against her that were eventually dismissed in their entirety.

(*Id.*, ¶ 76.) In her Response, Plaintiff again refers to her claim as one of sex discrimination. (Doc. # 64 at 41) ("Plaintiff . . . has met her burden to establish a prima facie case of sex discrimination under Title VII.") Yet, as Defendants note, Plaintiff does not seem to fully understand the nature of her claim. Throughout her often incoherent Response, Plaintiff alternately characterizes her Title VII claim as one of sex discrimination and one for a hostile work environment, without recognizing any

12

distinction between the two claims.  She also repeatedly refers to "retaliation"[7] and, in passing, to a "constructive discharge."  As the Court has previously noted, the Federal Rules of Civil Procedure do not "permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case."  *Orr*, 417 F.3d at 1153.  The Court will hold Plaintiff to the theory pleaded in her Amended Complaint and the one on which discovery was conducted.

Before addressing whether Plaintiff has shown that there exists a genuine issue for trial on her Title VII discrimination claim, the Court first considers Defendants' argument that most of the allegedly discriminatory acts should be excluded from consideration because they are time-barred.  An employee wishing to challenge an employment practice under Title VII must first "file" a "charge" of discrimination with the EEOC.  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1163 (10th Cir. 2007) (citing 42 U.S.C. § 2000e-5(e)(1)).  Although the applicable deadline for filing a charge with the EEOC depends on a variety of circumstances, "the latest possible filing date is 300 days from the last allegedly unlawful act."  *Id.*  If the employee does not submit a timely EEOC charge, he or she may not proceed to court.  *Id.*; *see also Semsroth v. City of Witchita*, 304 F. App'x 707, 717 (10th Cir. 2008) (unpublished) (affirming the district court's exclusion of conduct that occurred outside the 300-day window).  In this case, Plaintiff filed her charge of discrimination with the EEOC on October 26, 2010.  (Doc.

---

[7] Plaintiff seems to also confuse her Title VII claim with her First Amendment retaliation claim. For example, she alleges in the section of her Response concerning her Title VII claim that she "suffered pervasive retaliation as an ensuing consequence of speaking out about the IA to [Major] Lind." (Doc. # 64 at 40.)

# 59-28.) Thus, any allegedly discriminatory acts that occurred prior to December 30, 2009 are time-barred.

In her Response, Plaintiff argues that her pre-December 30, 2009 allegations of sex discrimination should be considered because her hostile work environment claim does not require her to file each separate instance of discrimination with the EEOC. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002) (holding that consideration of the entire scope of a hostile work environment claim includes behavior which is outside the statutory time period). This argument misses the mark because Plaintiff did not bring a hostile work environment claim. Although Plaintiff mentions the term "hostile work environment" in the fact section of her Amended Complaint, her complaint does not allege the elements of a hostile work environment claim, nor does she assert that the workplace was hostile due to her sex.[8] The mere invocation of the term "hostile work environment" is not sufficient to state a hostile work environment claim. As such, the *Morgan* exception does not apply and any discriminatory acts that occurred prior to December 30, 2009 are time-barred.[9]

---

[8] Plaintiff alleged that she was forced to resign because of "an unbearably hostile work environment." (Doc. # 22, ¶ 63.) She does not allege that her work environment was hostile because of her gender.

[9] Even if Plaintiff had properly plead a hostile work environment claim, summary judgment would be appropriate on such a claim. To bring "a claim of sex discrimination based on a hostile work environment," Plaintiff must "show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012). Plaintiff has failed to create a genuine dispute of material fact that any of the allegedly discriminatory acts were gender-related or that such discrimination was sufficiently severe or pervasive.

To prevail on her Title VII discrimination claim against the CDOC,[10] Plaintiff must establish intentional discrimination through either direct or indirect evidence. *See Orr*, 417 F.3d at 1149. Because Plaintiff lacks any direct evidence of discrimination, the Court applies the familiar *McDonnell Douglas* burden shifting analysis to Plaintiff's discrimination claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* approach, Plaintiff must first establish a *prima facie* case of discrimination by Defendants. Plaintiff has not done so.

To establish a *prima facie* case of discrimination, Plaintiff must present evidence that "(1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). Although Plaintiff, as a female, is a member of a protected class, she has not shown that she suffered any adverse employment action or that any such action occurred under circumstances giving rise to an inference of discrimination. The only discrete act identified by Plaintiff that occurred after December 30, 2009 is the April 2010 Performance Documentation she received for making an inappropriate entry in an inmate's chronological log.[11] (Doc. # 59-26.)

---

[10] Although Plaintiff does not specify whether her Title VII claim is brought against any particular Defendants, the Court assumes that her Title VII claim is brought against the CDOC only. *See Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996) ("[W]e agree with the majority view that, taken as a whole, the language and structure of amended Title VII continue to reflect the legislative judgment that statutory liability is appropriately borne by employers, not individual supervisors.").

[11] Plaintiff also asserts that she was constructively discharged, which would have occurred after December 30, 2009. However, to succeed on a constructive discharge theory, Plaintiff

Defendants contend that the April 2010 Performance Documentation issued by Captain Rusher was not an adverse employment action. The Court agrees. Adverse employment actions are acts that "constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006). The April 2010 Performance Documentation had no apparent effect on Plaintiff's employment status, and so it does not constitute an adverse employment action.[12] *See Armstead v. Wood*, No. 10-cv-02783, 2012 WL 2298495, at *7 (D. Colo. June 15, 2012) (unpublished) (finding that poor job evaluation is not an adverse employment action unless it causes a significant change in employment status); *Weil v. Carecore Nat., LLC*, 883 F. Supp. 2d 1289, 1298 (D. Colo. 2011) (same). Plaintiff also has failed to establish any circumstances giving rise to a reasonable inference that the April 2010 Performance Documentation was discriminatory. Thus, Plaintiff has failed to establish a *prima facie* case of discrimination, and summary judgment is appropriate on her sex discrimination claim.

---

must show that Defendants' actions were not merely adverse, but were intolerable. *See, e.g.*, *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805-06 (10th Cir. 2007) (female employee not constructively discharged, despite evidence the Defendant consistently subjected female employees to derogatory and explicit comments). Plaintiff has not presented sufficient evidence to show that she was constructively discharged. In her Response, Plaintiff admits that she had not been constructively discharged from her employment as of October 26, 2010. (Doc. # 64 at 38.) Although she claims that she was constructively discharged from her employment on October 31, 2010, there is no evidence of any event that made working conditions at Limon suddenly intolerable after October 26, 2010.

[12]  Plaintiff's Response is devoid of argument that the April 2010 Performance Documentation was an adverse action.

### C.     MALICIOUS PROSECUTION CLAIM

Finally, Plaintiff brings a malicious prosecution claim under 42 U.S.C. § 1983 against Defendants Massingill, Trani, Lind, and Rush, alleging that they "caused false criminal charges to be brought against [Plaintiff] for a crime they knew she did not commit."  (Doc. # 22, ¶ 82.)

Section 1983 provides a federal civil remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution" by any person acting under color of state law.  42 U.S.C. § 1983.  The analysis in a § 1983 case begins with the identification of the precise constitutional right allegedly infringed.  *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011).  Here, Plaintiff does not specify which of her constitutional rights she alleges was violated by Defendants' conduct.  However, malicious prosecution claims are generally premised on a violation of the Fourth Amendment right to be free from unreasonable seizures, and so the Court will construe Plaintiff's claim as such.[13]

---

[13]   Although the Tenth Circuit has stated that "malicious prosecution claims are Fourth Amendment claims," *Nielander v. Bd. of Ctny. Comm'rs of Ctny. of Republic, Kan.*, 582 F.3d 1155, 1165 (10th Cir. 2009), the Tenth Circuit has also suggested that a § 1983 claim malicious prosecution may also be premised on a violation of the procedural component of the Due Process Clause.  *See Wilkins v. DeReyes*, 528 F.3d 790, 797 n.4 (10th Cir. 2008).  As Plaintiff was never arrested, however, her § 1983 cannot be premised on a violation of procedural due process.  *See Pierce v. Gilchrist*, 359 F.3d 1279, 1285-86 (10th Cir. 2004) ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause."); *see also McCarty*, 646 F.3d at 1285 (plaintiff brought § 1983 malicious prosecution for alleged violations of his procedural due process rights, alleging that forensic chemist testified falsely at trial and intentionally destroyed or withheld exculpatory evidence).

To prevail on this claim, Plaintiff must show that she was "seized" under the Fourth Amendment.[14] *See Nielander v. Bd. of Ctny. Comm'rs of the Ctny. of Republic of Kan.*, 582 F.3d 1155, 1165 (10th Cir. 2009). The Court agrees with Defendants that Plaintiff was not "seized" because she was never arrested or incarcerated. Although Plaintiff was served with a criminal summons and complaint, the Tenth Circuit has "declined 'to expand Fourth Amendment liability in cases where the plaintiff has not been arrested or incarcerated.'" *Mata v. Anderson*, 635 F.3d 1250, 1254 (10th Cir. 2011) (quoting *Becker v. Kroll*, 494 F.3d 904, 913-914 (10th Cir. 2007)); *see also Nielander*, 582 F.3d at 1165 (rejecting argument that plaintiff was seized under the Fourth Amendment where he had received a criminal summons but had never been arrested or imprisoned). Thus, Plaintiff has failed to show a Fourth Amendment violation on which to base her § 1983 malicious prosecution claim, and judgment should be entered on this claim as a matter of law.

---

[14] In addition to alleging a constitutional violation, a § 1983 plaintiff must prove other tort elements to succeed on a malicious prosecution claim. The elements of a malicious prosecution claim, as applicable in a § 1983 case, are:

> (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.

*McCarty*, 646 F.3d at 1284. Because Plaintiff has not shown a federal constitutional violation, however, the Court need not determine whether Plaintiff has demonstrated a genuine dispute of material fact on these tort elements.

## IV. **CONCLUSION**

Based on the evidence in the record, Plaintiff has not shown that there exists a genuine dispute of material fact for trial on any of her three claims.[15]

Accordingly, it is ORDERED that Defendants' Amended Motion for Summary Judgment (Doc. # 59) is GRANTED.

It is FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE. The Final Trial Preparation Conference set for October 12, 2012, and the five-day Jury Trial set to commence on October 29, 2012, are VACATED.

It is FURTHER ORDERED that Defendants shall have its costs by the filing of a Bill of Costs with the Clerk of the Court within ten days of the entry of judgment.  Each party shall bear its own attorneys' fees.

DATED:  July  31  , 2012

BY THE COURT:

_Christine M Arguello_
_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[15] Because Defendants' actions did not violate a federal constitutional or statutory right, the individual defendants are entitled to qualified immunity.  *See Greene v. Barrett*, 174 F.3d 1136, 1142 (10th Cir. 1999).